[No. 23630. Department One. March 24, 1932.]

H. R. FISCHNALLER, *Respondent*, v. FRANK SUSSMAN, *Appellant*.[1]

*S. A. Gagliardi*, for appellant.

*L. B. Schwellenbach* and *Robert B. Abel*, for respondent.

BEELER, J.—The plaintiff brought this action to recover damages for the wrongful conversion of per-

[1] Reported in 9 P. (2d) 378.

sonal property consisting of steel railway rails. The plaintiff alleged that, prior to and during the month of September, 1929, he was the owner of approximately 110 tons of logging railroad rails, located at Carlisle, Washington; and that, between the months of September and November of that year, the defendant, without authority, right or permission, seized and converted the rails to its own use, and refused, on demand, to return them.

The defendant in its answer denied the material allegations of the complaint, and by cross-complaint alleged that, from November 5 to December 13, 1929, there had been shipped to its warehouse and junk yard at Tacoma, Washington, second-hand steel rails for storage; that it was at all times ready and willing to return the rails, provided the storage, freight and labor charges which it had advanced for handling and transporting the rails, were paid. The reply placed in issue the affirmative allegations of the cross-complaint.

Upon these issues, the cause proceeded to trial, and resulted in a verdict for the plaintiff in the sum of $1,815. The defendant's motion for a new trial was overruled, and judgment entered on the verdict. The defendant has appealed.

The appellant contends that the court erred: First, in the giving of certain instructions to the jury, and in the refusal to give its proposed instruction No. 6; second, in not permitting the appellant to prove the disbursements or payments it had made for labor and transportation charges in handling the steel; third, in overruling its motion for a new trial.

The facts are these: For several years prior to September, 1929, the respondent owned a sawmill at Carlisle, Washington, together with a logging railroad extending from its mill into the woods, and from its

mill to the Northern Pacific railway tracks; that the steel rails on this logging railroad were owned partially by one Neff and partially by the respondent, the former owning the light rails—twenty pounds or less, and the latter the heavy rails—thirty pounds or upwards.

July 25, 1929, the Crystal Coal Company, with offices at Tacoma, Washington, through its president and secretary Gerlach, and one Lang, working out of the office of the coal company, interviewed Neff with a view of purchasing his rails. As a result of these negotiations, Neff sold his rails to the coal company, and the company in turn delivered to him its promissory note of five hundred dollars, together with two thousand dollars of its corporate stock, in payment thereof. About thirty days later, and after the appellant Sussman had examined the rails at Carlisle, he purchased the Neff rails from the coal company.

In September following, Lang ordered Neff to tear up his rails, and the latter employed a Mr. St. Ours to perform the necessary work in connection therewith. While St. Ours was engaged in taking up the Neff rails, Lang again appeared on the scene, and ordered him to tear up and remove *all* of the rails, stating he had purchased the heavy rails from the respondent. St. Ours testified that Lang said: "I want all the steel; I bought all the steel, and I want it all. From now on pick it all up."

About October 5, the respondent, Fischnaller, who prior to and at that time was residing and operating a hotel at Omak, Washington, distanced several hundred miles from Carlisle, happened to be in Carlisle, and incidentally learned that his steel logging rails were being removed. Thereupon, he instructed St. Ours to pile his rails in the mill yard at Carlisle. The respondent also gave Lang explicit orders not to touch nor

remove his rails. On or about October 12, the respondent returned to Carlisle, and paid all labor charges incurred up to that time in removing and piling his rails. The respondent again left Carlisle, and returning three or four weeks later, discovered that all of his rails had been removed and shipped away.

Lang testified that Sussman paid all of his expenses in connection with "getting the rails out," and that he had informed Sussman that the heavy rails "belonged to Fischnaller."

"Q. Now, you said that Mr. Sussman paid you for your expenses involved in reference to this transaction? A. Yes, sir. It cost me four or five extra trips to Hoquiam and down to Carlisle and they can not be made for nothing. . . . Q. Now, at the time that Mr. Sussman advanced these charges did he know that these rails belonged to Mr. Fischnaller? A. Yes, sir. Q. *You told him they belonged to Mr. Fischnaller?* A. *Yes, sir, that was the first thing he was told.*" (Italics ours.)

Sussman, himself, corroborated Lang. The evidence is clear that he knew that the rails belonged to Fischnaller, and that Fischnaller had not authorized the shipment of his rails to Tacoma.

"Q. *You knew at that time that the rails belonged to Mr. Fischnaller?* A. *Yes, sir.* Q. And that it was down there in Carlisle? A. Yes, sir. Q. And was being shipped here? A. Yes, sir. Q. And that Mr. Fischnaller did not know anything about it? A. Well, they could not locate Mr. Fischnaller at that time. Q. *Well, you knew Mr. Fischnaller did not know anything about it?* A. *Well, that is what they told me; they could not locate him.*" (Italics ours.)

We quote from the testimony of Lang and Sussman to show that the latter was not acting in good faith in gaining possession of the respondent's rails.

This is not a case where one unintentionally and inadvertently takes or comes into possession of another's property. The appellant gained possession of the respondent's rails willfully and designedly.

In the first place, the Crystal Coal Company, through Gerlach and Lang, acquired the Neff rails by delivering to him its worthless corporate note and corporate stock. The evidence is quite clear that Gerlach, and possibly Lang also, knew that the promissory note and the corporate stock were wholly worthless, because soon thereafter that company became a bankrupt.

Just as Gerlach and Lang had schemed to acquire the Neff rails, so Sussman and Lang cunningly and designedly confederated and conspired together for the purpose of acquiring the respondent's rails without paying for them. This is borne out, not only by the testimony of Sussman and Lang, but also by the correspondence. Under date of October 30, 1929, Lang wrote to St. Ours from Tacoma as follows:

*"Do not let Fischnaller or anyone get possession of the rails. Load and ship and if anyone comes, refer them to Martin Smith and let him handle them."* (Italics ours.)

We are satisfied that Sussman was fully acquainted with everything Lang was doing. Under date of November 9, 1929, Lang again wrote St. Ours:

"Your letter of the 8th just received. And I am thoroughly disappointed; you promised me two cars of rails; *and I so represented to Mr. Sussman.* Now you come back after getting the money for your men and yourself and report that you can not get the second car." (Italics ours.)

In view of the admitted testimony of Lang and Sussman, the court properly instructed the jury that the measure of damages was the reasonable market value of the rails *at the time* of the conversion.

█ Sussman knew the respondent was the owner of the rails. He knew that no authority had been given to St. Ours or Lang to ship them to Tacoma. Hence, the appellant was not entitled to be reimbursed for the moneys it had advanced for labor and transportation in handling the rails.

" 'There is no doubt that if a man furtively, and in bad faith, robs his neighbor of his property, and because it is underground is probably for some little time not detected, the court of equity in this country will struggle, or, I would rather say, will assert its authority to punish the fraud by fixing the person with the value of the whole of the property which he has so furtively taken, and making him no allowance in respect of what he has so done, as would have been justly made to him if the parties had been working by agreement.' [*Livington v. Rawyards Coal Co.*, 5 App. Cas. 25.]" *Bolles Wooden Ware Co. v. United States*, 106 U. S. 432.

To the same effect, see *Bailey v. Hayden*, 65 Wash. 57, 117 Pac. 720.

█ Nor did the court err in refusing to give to the jury the appellant's requested instruction No. 6, which reads:

"You are instructed that before the plaintiff can recover in this action he must prove, first, that he was the owner of the property in question and had a right to the possession of it at the time he claims defendants, or either of them, converted it to their own use; and, second, he must prove that defendants, or either of them, actually converted the property to their own use. A conversion of personal property takes place whenever one person assumes the ownership or control of another's property to the exclusion of and against the rights of such other person and against his consent. So, in this case, if you find from the evidence that the defendants, or either of them, did not claim to be the owner of the property as against the plaintiff, but claimed only that they were entitled to a lien

against it on account of money paid out for labor and/or freight and storage charges, then the making of such claim or claims of themselves would not constitute conversion.''

The respondent was entitled to its rails immediately upon demand, and the refusal of Sussman to return them constituted conversion. *Semple v. Morganstern,* 97 Conn. 402, 116 Atl. 906, 26 A. L. R. 21. The assumption of ownership of another's property is not essential to constitute a conversion.

''So it is no protection to one who has received property and disposed of it in the usual course of trade, that he did so in good faith, and in the belief that the person from whom he took it was owner, if in fact the possession of the latter was tortious.'' Cooley on Torts, p. 867.

Here Sussman was not acting *in good faith*. In fact, every act of his was directly to the contrary. It follows from what has been said that the court properly overruled the appellant's motion for a new trial.

Judgment affirmed.

Tolman, C. J., Mitchell, Parker, and Herman, JJ., concur.