[No. 33491. *En Banc.* January 11, 1957.]

Louis H. Pettaway, *Respondent*, v. Commercial Automotive Service, Inc., *Appellant*.[1]

[1]Reported in 306 P. (2d) 219.

*Bogle, Bogle & Gates* and *J. Kenneth Brody,* for appellant.

*Kane & Spellman,* for respondent.

FINLEY, J.—This is an action for damages for the breach of an alleged contract for the purchase and sale of an automobile.

The defendant company displayed a special model, a 1953 Buick "Skylark," automobile in its show window. The plaintiff saw the car and discussed its purchase with a Mr. Shaw, one of defendant corporation's salesmen. Thereafter, the plaintiff signed one of the defendant corporation's order forms on which the price of the new car was stated as $5,667, and $1,500 was designated as a credit

allowance for plaintiff's 1948 Chrysler. The plaintiff, a merchant seaman, testified that the parties agreed that he would make a cash payment of five hundred dollars or more, upon his return from a voyage to the Orient, presumably sometime in 1954; that the deferred balance was to bear interest and to be paid in thirty-six monthly installments at the rate of at least one hundred dollars per month. Plaintiff's testimony further indicated that, when he returned from the voyage of some two or three months duration, he tendered a cash payment to Mr. Shaw in an amount in excess of the five hundred dollars; that he was informed the defendant corporation had sold the 1953 Buick "Skylark" model to someone else. Apparently, the manufacturer had allotted only three automobiles of the particular model to the defendant company, and defendant company failed to produce one for the plaintiff. Thereupon, plaintiff commenced this action for damages for breach of contract. At the time the action was commenced, defendant company still had plaintiff's 1948 Chrysler in its possession.

The jury awarded $1,325 to plaintiff. By answer to special interrogatories, it set (a) $825 as the market value of plaintiff's Chrysler; (b) $300 for plaintiff's disappointment, mental anguish, loss of sleep, humiliation, and damages to his reputation, allegedly resulting from the breach of the contract and the deprivation of the allegedly unique chattel; and (3) $200 by reason of deprivation of use of an automobile. The defendant corporation appealed, but its salesman, a codefendant herein, did not.

█ The basic question in this case is whether the parties litigant entered into a simple, yet legally significant, contractual relationship for the sale and purchase of an automobile. The essentials of such a contractual relationship could be spelled out as follows: (1) a vendor and a vendee; (2) an agreed price; (3) certainty as to the subject matter; (4) agreement or a promise by the vendor to sell for the agreed price; (5) agreement or a promise by the vendee to purchase at the agreed price. In its instruction No. 19, the trial court advised the jury as follows:

"The terms of a contract must be definite and ascertainable. Neither the court nor the jury can create a contract or create terms of a contract where the parties to the contract have failed so to do. If any element essential to the contract has been omitted or is incapable of ascertainment, the contract is invalid and unenforceable.

"The alleged contract involved in this case is a contract for the purchase and sale of an automobile. The minimum essential requirements of such a contract are an agreement as to the automobile to be sold, the purchase price, and the method and terms of payment. If another automobile is to be given in part payment, it is essential that the parties agree, first, upon the acceptance of such other automobile as part payment, and, second, upon the value of such other automobile to be credited upon the purchase price."

■ It may be assumed that a competent legal craftsman would have handled the transaction somewhat differently. But the question is not what a legal craftsman would have done or what advice he would have given to the parties. The question presented here concerns the conduct of laymen—what they did or did not do—and the legal result or effect to be ascribed to their actions or conduct. In 1 Corbin on Contracts 66, 69, § 29, it is said:

"We must not jump too readily to the conclusion that a contract has not been made from the fact of apparent incompleteness. People do business in a very informal fashion, using abbreviated and elliptical language. A transaction is complete when the parties mean it to be complete. It is a mere matter of interpretation of their expressions to each other, a question of fact. An expression is no less effective that it is found by the method of implication."

■■ We are convinced that instruction No. 19 was a proper statement of the law, and that the jury arrived at a proper solution of the basic dispute between the parties; namely, that the arrangements between them were not too indefinite to constitute a binding legal contract for the sale and purchase of an automobile. *Miskowitz v. Starobin,* 181 Misc. 445, 41 N. Y. S. (2d) 786; *In re Renfro-Wadenstein,* 47 F. (2d) 238.

Appellant further contends that the arrangements between the parties did not extend beyond mere prelimi-

nary negotiations; that this is at least partially evidenced by the fact that the parties contemplated the execution of a more formal document to embody the terms of their agreement.

The fact that the parties contemplated that a more formal contract would be executed did not necessarily vitiate the binding force of their simple buy-and-sell agreement. Under circumstances such as herein involved, a written draft of the contract is viewed merely as a convenient memorial or record thereof. *Fuller v. Ostruske,* 48 Wn. (2d) 802, 296 P. (2d) 996.

In further support of its contention that the respondent failed to prove the existence of a contract, appellant argues that the corporation order form, which was partly filled in by the salesman, bore a printed statement to the effect that it was not binding until accepted by the company, and furthermore, that the order form never was specifically approved or accepted by the company. The acceptance of respondent's Chrysler constituted a part payment and took the sale out of the statute of frauds. Furthermore, under the circumstances, we think that the written order was not necessary to create a contract and that it has little significance other than being evidence of the price of the "Skylark" and the amount allowed for the Chrysler.

Now, as to the question of damages: Appellant contends that the court erred in submitting to the jury the issue of damages for deprivation of the use of respondent's Chrysler. The evidence was inadequate for the jury to make an award in any amount for that item. There is testimony in the record that respondent hired a taxicab a couple of times for six dollars; but these events were not connected with the breach of the contract in question. The award is the result of pure speculation. This assignment of error is well taken.

The jury awarded respondent three hundred dollars for the mental anguish occasioned by the failure to deliver the "Skylark" for "conspicuous consumption." The appellant contends that the court erred in submitting that

issue to the jury and instructing upon it. We agree. Consequential damages are sustainable if they flow naturally and inevitably from a breach of contract and are so related to it as to have been within the contemplation of the parties when they entered into it. *Dally v. Isaacson,* 40 Wn. (2d) 574, 245 P. (2d) 200. The emotional reactions peculiar to a particular individual which might flow from a breach of a contract of sale of an automobile are too subjective and variable to be contemplated prior to a breach of contract, or ascertainable afterward. Such suffering, if any, is not compensable in an action for damages for breach of contract.

In his complaint, respondent prayed for $2,000 for breach of the alleged contract to sell him the Buick "Skylark," and for $1,750 for damages for retaining his 1948 Chrysler. In answer to special interrogatories, the jury awarded no damages for appellant's breach in failing to deliver the new car, but as indicated above, the jury did allow $825 as the value of respondent's 1948 Chrysler at the time appellant took custody of the automobile, apparently on the theory that appellant had converted it. Value at the time of conversion of course would have been the proper measure of damages in a tort action. *Baumgardner v. Kerr-Gifford & Co.,* 144 Wash. 206, 257 Pac. 390; *Fischnaller v. Sussman,* 167 Wash. 367, 9 P. (2d) 378.

Here, however, respondent's action is for breach of contract. Furthermore, there is no evidence in the record to sustain an action for conversion. Under the contract for sale of the new car, respondent parted with the right to possession, and appellant came lawfully into possession of the 1948 Chrysler. *Bronner v. Van Cortlandt Vehicle Corp.,* 198 N. Y. S. 525. Respondent failed to show an unlawful taking, unlawful possession, unlawful user or misuser of the car, or an unlawful detention.

The proper measure of the buyer's damages where the seller has failed to deliver goods is the market value thereof at the place fixed for delivery, less any unpaid part of the contract price. McCormick on Damages 665, § 175; see, also, RCW 63.04.680. Under this standard, the buyer

is made whole in that he is put in as good a position as he would have been if the seller's obligation had been fulfilled.

In the trial court, the appellant excepted to the trial court's refusal to give an instruction which, in substance, embodied the above measure of damages. However, the trial court's refusal to give the requested instruction has not been assigned as error. Furthermore, no error has been assigned to the jury's award of damages of $825, ostensibly representing the value of respondent's Chrysler. There is no cross-appeal. As a consequence of the foregoing, the matters or questions involved will not be considered on appeal. *Walker v. Copeland,* 193 Wash. 1, 74 P. (2d) 469; Rules on Appeal 42 (1) (f) and 43, 34A Wn. (2d) 45, 47, as amended effective January 2, 1953.

For the reasons stated hereinbefore, it was error to allow the respondent damages in the amounts of $300 for mental anguish and $200 for loss of use of an automobile, and the judgment must be modified and reduced in this respect. However, as to the jury's award of $825 for respondent's 1948 Chrysler, the judgment should be affirmed. It is so ordered.

MALLERY, SCHWELLENBACH, HILL, WEAVER, ROSELLINI, and OTT, JJ., concur.

DONWORTH, C. J. (concurring in the result)—While I agree that the judgment for respondent for $825 should be affirmed for the reasons stated in the last two paragraphs of the majority opinion, I cannot agree with the majority in holding that the parties had entered into an enforceable contract, which could be the subject of an action for damages for the breach thereof.

In my opinion, the rule relating to real-estate contracts announced in *Hedges v. Hurd,* 47 Wn. (2d) 683, 289 P. (2d) 706 (to which I dissented), to the effect that an incomplete contract, while not sufficiently definite to be the basis for an action for specific performance, may, nevertheless, give rise to an action for damages for its breach, cannot be applied to the facts presented in this case. In so holding, the majority opinion in this case incorrectly applies the

rule quoted therein from Corbin on Contracts to the facts shown by the testimony of respondent.

Respondent, who was the buyer, signed appellant's order form, which stated the price of the new car as being $5,667, and the credit for the old car as being $1,500.

Below these figures on the form appears the following:

"Balance to be paid
Cash ☐   Contract ☐       Net cash balance    4167"

It thus appears that appellant was selling cars either for cash or on conditional sales contract. While neither type of transaction was indicated on the order form, it is conceded in respondent's brief that "the parties contemplated that a conditional sale contract be executed, embodying the terms of their agreement."

Respondent testified he expected that, in addition to the fifteen hundred dollars credit for his old car, he was to pay five hundred dollars or more in cash when he returned from his next voyage to China, and similar additional amounts at the end of each subsequent voyage. He then testified:

"Q. In other words you had no definite schedule of payments; you were going to pay them certain amounts as you found you would be able to pay them? A. Well, he wanted me to pay 36 months; he fixed out 36 months; but me being a seaman and all— Q. You didn't want to pay 36 months, did you? A. What did you say? Q. You didn't want the contract to run 36 months? A. Yes, I did but I told him if I wanted to come back and give him a thousand dollars or 900 or 500, was that okay; and he said, Yes, that would be fine; but I wanted the contract to be 36 months just in case I wasn't on a ship or couldn't work. Q. Now does that mean you were going to enter into some kind of contract account for 36 months? A. Well, I've got a contract; they've got my car at 1500 for security, and I'm going to give them 500 when I come back. He went in and talked to the manager, and I had to come back and pay $500 when I come back. You see, I had a lot of faith and confidence; I didn't think he was trying to beat me or nothing because I don't have no hate for nobody; I don't have no malice against Commercial or no one. Q. Then your whole agreement is comprised of this piece of paper; is that it? A. I don't know what they have at the office there, but I was

under the impression that I'd pay $500, then pay 36 months; and I could drive my car, make 36 payments—a hundred dollars a month, $70 a month—but I was going to pay it up quicker than that, even if I had to borrow money on my home, which I could do, you know. Q. How much were the monthly payments supposed to be? A. Beg your pardon? Q. How much were the monthly payments supposed to be? A. He said if I'd pay $500, when I come back — Q. Will you tell me how much the payments were going to be? A. A hundred dollars a month. Well, I says that I could make an allotment back to him of $300 a month and still have money, you know, to pay out. Q. Now were you supposed to pay any interest on the unpaid balance of this purchase price? A. Beg pardon? Q. Were you supposed to pay any interest on the unpaid balance of the purchase price? A. Well, Mr. Shaw told me that when I bought this car that after I paid the 500 down and the $100 a month, he said I have to pay interest on the balance. I said, Well, Mr. Shaw, if I come in and give you $800, maybe 500, no more—I mean no less than 500 because I didn't never make a trip where I make under $500, and for two months; and then the company gave me a hundred dollars and something for a bonus. So he told me I could; the quicker I got it down, there would be less interest or carrying charge. Q. Oh, so you were, in other words, supposed to pay interest on the unpaid balance? A. Beg your pardon? Q. You were supposed to pay interest on the unpaid balance? A. If it went 36 months. I just wanted to get the car and then borrow money on my home, or make out a back allotment. Q. I see. Now supposed the contract went only one month. Were you supposed to pay interest on one month for the unpaid balance? A. You are supposed to pay interest on anything for the time you've got it and owe for it. Q. I see. Now what was the rate of interest on this contract? A. Beg pardon? Q. What was the rate of interest you were going to pay on this contract? A. I didn't care just so I got the car; it didn't make me no difference. Q. Did you know what the rate of interest would be? A. I wasn't interest as long as I was going to pay for the car. . . . Q. What was the total amount of your monthly payments supposed to be? A. A hundred dollars a month. Q. Did that include interest? A. I don't know. . . . Q. And your agreement was then that after you made your 36 payments of a hundred dollars there would be only $167 left to pay? A. Besides the interest; I'm sure they are not going to carry it that long for nothing;

they don't do anybody that way. The company is not in business for their health; I know that. Q. So you were going to have to pay more than $3,667? A. I understand that, but if I pay $800 every time I come off a trip, maybe a thousand, I wouldn't have to pay that much interest. I would just have to pay the interest on the money that still I owe. I understood it that way. Q. But you don't know what the rate—you don't know what the interest was going to be, do you? A. Beg your pardon? Q. You don't know what the interest was to be? A. On 3600 dollars? Q. Yes. A. It couldn't be much if I pay $800 or a thousand dollars every time I come in. Q. But you don't know what the rate would be, the rate of interest, do you? A. It didn't make any difference to me. I was working. . . ."

Disregarding any conflicts in the testimony as to the negotiations between the parties and accepting respondent's own testimony as true, the situation prior to the alleged breach of contract appears to be substantially as follows:

After respondent's return from his voyage to China in 1954, he was to pay five hundred dollars or more in cash. The balance of $3,667 was to be paid in not more than thirty-six monthly instalments, beginning sometime in 1954, presumably at the rate of one hundred dollars per month. Respondent expected to pay interest on deferred balances but was not interested in the rate or dates of payment.

The evidence, when viewed most favorably to respondent, does not show any meeting of the minds of the parties regarding these important features of a conditional sales contract:

(a) When title to the "Skylark" would pass to him.

(b) The total contract price (principal plus interest).

(c) When the monthly payments would begin.

(d) The rate of interest on deferred payments, and whether payable out of the one hundred dollar monthly payments or in addition thereto.

(e) Whether time was of the essence of the contract.

(f) What notice of default, if any, should be given respondent prior to forfeiting his rights under the contract if he failed to perform his obligations thereunder.

(g) Whether, upon forfeiture, appellant could retain all payments theretofore made by respondent as liquidated damages.

(h) Which party assumed the risk of damage to, or destruction of, the car during the life of the contract.

(i) The type and amounts of insurance coverage which were to be carried against such risks.

The majority opinion states:

"The fact that the parties contemplated that a more formal contract would be executed did not necessarily vitiate the binding force of their simple buy-and-sell agreement. Under circumstances such as herein involved, a written draft of the contract is viewed merely as a convenient memorial or record thereof. *Fuller v. Ostruske*, 48 Wn. (2d) 802, 296 P. (2d) 996."

In view of the admission in respondent's brief, above referred to, and his own testimony quoted herein, there can be no doubt that the parties contemplated that they would execute a conditional sales contract. This is the type of contract which respondent admits the parties intended would be the written culmination of their negotiations. Since there was no proof that the minds of the parties had ever met on these important features of their contemplated conditional sales contract, there was no contract between them, and hence there could be no damages recovered for an alleged breach of contract.

A somewhat analogous situation was before this court in *Morrison v. Ahrens & Ahrens*, 131 Wash. 310, 230 Pac. 137, where the owner of a car delivered it to a dealer to be sold for not less than seven hundred dollars. The sale was made, but the dealer refused to remit to the former owner the proceeds on the ground that the parties had agreed that the proceeds were to be applied on the purchase of a new car from the dealer. In holding that there was no contract for the purchase of a new car, this court said:

"The appellant contends that there was a contract by virtue of which the sale price of the old car was to apply on the purchase price of a new one, and that for this reason the respondent was not entitled to any portion of the money

and was not entitled to any benefit thereof except by purchasing a new car and being given credit for the sale price of the old car.

"We are convinced, however, that there was no binding agreement to the effect that the respondent would purchase a new car in the event the old one was sold. It is true that there was considerable talk about it, and it is also doubtless true that both parties anticipated that the respondents would purchase a new car, but there was no such contract as can be enforced. There had been nothing said whatsoever concerning the terms of the purchase of the new car, other than that credit should be given for the sale price of the old one. For instance, nothing was said as to how and when the balance of the purchase price was to be paid. After the appellant had made the sale of the old car, negotiations were renewed concerning the purchase of a new one, but the parties were unable to agree upon the manner of payment, and for this reason no sale of the new car was made.

"For these reasons we are satisfied the appellant was not entitled to hold the money in its hands for the purpose of applying it on the purchase price of a new car.

"What we have said disposes of appellant's further contention that, in any event, they are entitled to deduct as damages the sum of $300, which represents the profit which it would have made had the respondent purchased a new car."

It is an elementary principle of law that every contract must consist of an offer and an acceptance resulting in a meeting of the minds.

The Restatement of the Law of Contracts expresses the rule as follows:

"Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions as stated in § 25.

"Comment:   a. Parties who plan to make a final written instrument as the expression of their contract, necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings.

It is possible thus to make a contract to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then fulfilled all the requisites for the formation of a contract. On the other hand, if the preliminary agreement is incomplete, it being apparent that the determination of certain details is deferred until the writing is made out; or if an intention is manifested in any way that legal obligations between the parties shall be deferred until the writing is made, the preliminary negotiations and agreements do not constitute a contract." 1 Restatement, Contracts, § 26.

Since it is admitted in respondent's brief that the parties intended that the final expression of their agreement should be in the form of a written conditional sales contract, the last sentence of the above quoted comment states the rule which is applicable to the situation now before us.

The recent case of *Simms v. Ervin*, 46 Wn. (2d) 417, 282 P. (2d) 291, presented a similar situation and further supports this view. In that case, the purchaser had, however, signed a conditional sales contract in addition to the car purchase order. After the seller had delivered possession of the car to the purchaser, the latter attempted to cancel and rescind the contract, contending that, since the seller had not signed the car purchase order, there was no acceptance of the order and consequently no contract. This court held that:

"Whatever may have been the purchaser's rights under this car purchase order, the order was superseded by the conditional sales contract signed the next night. It was the intent of the parties that all prior negotiations be integrated in that contract, and, as such, the contract became the final and only effective expression of the parties. Restatement, Contracts, 307, § 228; *Schnitzer v. Panhandle Lbr. Co.* (1942), 14 Wn. (2d) 434, 128 P. (2d) 501."

In the case at bar, the parties admittedly contemplated the execution of a conditional sales contract as the final expression of their agreement, and until that contract was executed, there never was any final and effective expres-

sion of their contractual negotiations. Hence, there could be no breach of a nonexistent contract.

An annotation found in 122 A.L.R. 1217 entitled "Formal or written instrument as essential to completed contract where the making of such instrument is contemplated by parties to verbal or informal agreement," cites many cases from this and other states which support my views as to the incompleteness of the alleged contract in the present case.

Assuming that the appellant "accepted" the respondent's Chrysler as a part payment for the "Skylark," thereby crediting respondent with the sum of fifteen hundred dollars (thus taking the sale out of the statute of frauds), I cannot accept the inference which the majority draw therefrom, *i.e.*, that the missing elements necessary to form a binding contract can be disregarded entirely.

Respondent failed to establish *prima facie* the existence of an enforcible contract, and in my opinion, the trial court erred in denying appellant's motion for judgment n.o.v.

I concur in that portion of the majority opinion relating to the recovery of damages for mental anguish and for deprivation of the use of respondent's old car.

As stated in the first paragraph of this opinion, I concur in affirming that portion of the judgment which gives respondent $825, being the amount which the jury found to be the value of his old car, apparently on the theory that appellant had converted it.